1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

IN RE: THE APPLICATION OF INNA
KHARLAMOVA, n/k/a ALISA YUNOVA
YASNAYA,

11

12

Plaintiff/Petitioner,

13

v.

14

PETER ROACH,

15

Defendant/Respondent.

CASE NO. C 14-5344 KLS

ORDER GRANTING PETITION

16

17     This matter is before the Court for disposition of Inna Kharlamova's Hague Convention

18 petition for return of her two children to Canada.  The undersigned held an evidentiary hearing

19 on August 25, 2014.  Petitioner appeared via videoconference from Toronto, Canada and was

20 represented by her counsel, Paul McVicker.  The Respondent was present and represented by his

21 counsel, Melanie Denton.  By agreement of the parties, the Court also considered the deposition

22 testimony of Olga Anetko.

23 //

24 //

1  Based on the facts presented to the undersigned, the Court concludes that the two

2  children should be returned to their mother in Canada, as that was their habitual residence prior

3  to the girls being retained by the Respondent in Washington.

**LAW**

**The Hague Convention**

6  As noted by the Ninth Circuit in *Mozes v. Mozes,* 239 F.3d 1067, 1069 (9th Cir. 2001), the

7  Hague Convention on the Civil Aspects of International Child Abduction ["Convention"] is

8  intended to prevent "the use of force to establish artificial jurisdictional links on an international

9  level, with a view to obtaining custody of a child." Elisa Perez-Vera, Explanatory Report ¶ 11, in

10  3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth

11  Session, Child Abduction 426 (1982) [Perez-Vera Report"].[1]  The Convention is aimed at the

12  "unilateral removal or retention of children by parents, guardians or close family members."

13  Beaumont & McEleavy, The Hague Convention on International Child Abduction 1 (1999).

14  As discussed in *Mozes, supra,* "[t]he preamble to the Convention describes the signatory

15  states as '[d]esiring to protect children internationally from the harmful effects of their wrongful

16  removal or retention.'  Effects which are thought to follow when a child 'is taken out of the

17  family and social environment in which its life has developed.' Perez-Vera Report at ¶ 11.  This

18  may occur either through the 'removal [of a child] from its habitual environment,' or by 'a

19  refusal to restore a child to its own environment after a stay abroad.' *Id.* at ¶ 12." *Mozes, supra,*

20  at p. 1070.  "To this end, when a child who was habitually residing in one signatory state is

21

22  _____

23  [1] Elisa Perez-Vera was the official Hague Conference reporter, and her explanatory report is " 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.' " *Shalit v. Coppe*, 182

24  F.3d 1124, 1127-28 (9th Cir. 1999).

wrongfully removed to, or retained in, another, Article 12 provides that the latter state 'shall order the return of the child forthwith.' " *Mozes, supra,* at p. 1070.

**Wrongful Removal or Retention**

In order for a removal or retention to trigger a state's obligation under the Convention, the removal or retention must satisfy the requirements of Article 3:

The removal or the retention of a child is considered wrongful where –

(a)  it is in breach of rights of custody attributed to a person, an institution, or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention;

and

(b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

As set forth on *Mozes*, a court applying these provisions of Article 3 of the Convention must answer the following four questions:

(1)  When did the removal or retention at issue take place?  (2) Immediately prior to the removal or retention, in which state was the child habitually resident?  (3)  Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?  (4)  Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes*, *supra*, at p. 1070.

The determination of "habitual residence" is "the central – often outcome-determinative – concept on which the entire system is founded."  *Mozes,* supra, at p. 1072.  To establish a "habitual residence" the law requires that there be a settled purpose.  "All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Mozes, supra,* at p. 1074.

//

//

**Abandonment of Prior Habitual Residence**

"[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. (footnote omitted)  Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration. (footnote omitted)." *Mozes, supra,* at 1075.

In considering whether a prior habitual residence has been abandoned, the Court must determine "whose settled intention determines whether a *child* has abandoned a prior habitual residence." *Mozes, supra,* at p. 1076.  The Ninth Circuit, in *Mozes* at p. 1076, concluded that "in those cases where intention or purpose is relevant – for example, where it is necessary to decide whether an absence is intended to be temporary and short-term – the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence."  This is accomplished by determining whether the parents had a settled mutual intent to abandon the prior habitual residence.

"On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. . . . On the other side are the cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period. . . . In between are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration."

*Mozes, supra,* at pp. 1076 – 1077.  For example, if parents agreed that a stay would last indefinitely, it would be reasonable to infer mutual abandonment of the prior habitual residence.  Other times, however, "circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred." *Mozes, supra,* at p. 1077.  However, when there is no shared intent, "a prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." *Mozes, supra,* at p. 1082.  In addition, the Court must

1   also determine whether, from all the available evidence, the parent petitioning for the return of a

2   child has already agreed to the child's taking up habitual residence where it is.

3       While a decision to alter a child's habitual residence depends on the settled intention of

4   the parents, in order to accomplish the change there must also be an actual change in geography

5   and the passage of an appreciable period of time (citation omitted), one that is 'sufficient for

6   acclimatization.' " *Mozes*, *supra,* at p. 1078.

7   **Acclimitization**

8       "A more difficult question is when evidence of acclimatization should suffice to establish

9   a child's habitual residence, despite uncertain or contrary parental intent.  … Despite the

10   superficial appeal of focusing primarily on the child's contacts in the new country, however, we

11   conclude that, in the absence of settled parental intent, courts should be slow to infer from such

12   contacts that an earlier habitual residence has been abandoned." *Mozes, supra,* at p. 1079.  "The

13   function of a court applying the Convention is not to determine whether a child is happy where it

14   currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to

15   the primary locus of the child's life."  Mozes, supra, *at p. 1079.*

> Children can be remarkably adaptable and form intense attachments even in
> short periods of time – yet this does not necessarily mean that the child expects
> or intends those relationships to be long-lived.  It is quite possible to
> participate in all the activities of daily life while still retaining awareness that
> one has another life to go back to.  In such instances one may be "acclimatized"
> in the sense of being well-adjusted in one's present environment, yet not
> regard that environment as one's habitual residence.  (footnote omitted).  It
> thus makes sense to regard the intentions of the parents as affecting the
> length of time necessary for a child to become habitually resident (footnote
> omitted) because the child's knowledge of these intentions is likely to
> color its attitude toward the contacts it is making.

22   *Mozes, supra,* at pp. 1079-80.  In making this determination, the question to be answered is

23   "whether we can say with confidence that the child's relative attachments to the two countries

24   have changed to the point where requiring return to the original forum would now be tantamount

1    to taking the child 'out of the family and social environment in which its life has developed.' "

2    *Mozes, supra,* at p. 1081.  In particular, the question to be answered is whether the habitual

3    residence has been supplanted by the child's new location as the "locus of the children's family

4    and social development." *Mozes, supra,* at p. 1084.  In making the acclimatization inquiry, the

5    Court is mindful that "in the absence of settled parental intent, courts should be slow to infer

6    from such contacts that an earlier habitual residence has been abandoned." *Papakosmas v.*

7    *Papakosmas,* 483 F.3d 617 (9th Cir. 2007).

8    **Affirmative Defenses**

9         If  the Court determines that the child should be returned pursuant to the terms of the

10   Convention, it is not bound to return the child if certain affirmative defenses are proved.  The

11   one applicable affirmative defense raised by the Respondent in this case is encompassed in

12   Article 13 (b) of the Convention:  "there is a grave risk that his or her return would expose the

13   child to physical or psychological harm or otherwise place the child in an intolerable situation."

14        The grave-risk exception to the return remedy was, like the other exceptions,
          'drawn very narrowly lest [its] application undermine the express purposes
15        of the Convention – to effect the prompt return of abducted children.' *Department*
          *of State: Hague International Child Abduction Convention; Text and Legal*
16        *Analysis,* 51 Fed. Reg. 10,494, 10, 509 (Mar. 26, 1986) [hereinafter 'State
          Department Report'].  The risk must be 'grave, not merely serious,' *id.* at 10,501,
17        and must be proven by clear and convincing evidence, 42 U.S.C. § 11603(e)
          (2)(A).  Moreover, because the Hague Convention provides only a
18        provisional, short-term remedy in order to permit long-term custody proceedings
          to take place in the home jurisdiction, the grave-risk inquiry should be
19        concerned only with the degree of harm that could occur in the immediate
          future.

20

21   *Oddy v. Morris,* 2012 WL 464227, *8 (D. Hawai'i).

22   //

23   //

24   //

**FACTS**

The Petitioner and Respondent are the parents of two daughters – D. Kharlamova (born December 2, 2002) and A. Kharlamova (born February 17, 2006).  Both children were born in Toronto, Canada.  Petitioner Inna Kharlamova is a Russian citizen who moved to Canada, from Russia, in 2001 and has obtained permanent resident status in Canada.  Respondent Peter Roach is an American citizen.

The Petitioner and Respondent met in Toronto in late summer 2001.  At that time the Respondent was separated from his wife and he was residing in Las Vegas.  He had employment in Toronto and would be there every week between 1999 and 2002.  When in Toronto the Petitioner would stay with the Respondent in an apartment he rented for her.  It is unclear when the relationship between the parties ended but the Respondent reconciled with his wife in 2006.

As noted, the two children were born in Toronto and lived there continuously until 2009.  The Respondent maintained contact with his two daughters by visiting with them in Canada fairly regularly and talking with them on the phone.  The Respondent also provided financial assistance to the Petitioner for rent, food, various expenses including car insurance and for the girls.  There has never been a court order entered which required any type of child support from the Respondent to the Petitioner nor has there been a court order finding the Respondent to be the father of the two girls – but that is not a contested fact.

On July 16, 2008 a Final Uncontested Order was entered in the Ontario Court of Justice which gave "final" custody of the two girls to Inna Sexton (Kharlamova) and permitted the Respondent to have access to each child.  "The terms of access are:  Supervised in Canada and to be supervised by the Applicant, Inna Sexton alone."  In addition, the Order permitted the Petitioner "to travel abroad without the consent of the Respondent father and is allowed to obtain, apply and renew passports for each child mentioned above without consent of the

1  Respondent father." Trial Exhibit 1.  By letter dated June 22, 2008 the Respondent wrote to the

2  Ontario Court of Justice and stated the following:

3       The issue of custody arose because of intended travel to Russia.  As
         explained to me an extended stay in Russia required my two children to
4        have Russian documentation, otherwise they would be provided tourist
         visas and would not be permitted to stay in Russia beyond 30 days.
5
         I am agreeing to grant Inna Sexton (Kharlamova) sole custody of the
6        children to prevent any issues with travel, documentation or Russian laws
         until the children are back in Canada, or until Inna and I make further
7        custody/family arrangements.  Inna and I have agreed that I would have
         unrestricted access and visitation rights to the children.
8
9  Trial Exhibit 2.

10       According to the Petitioner, she obtained the Order from the Ontario Court of Justice to

11 facilitate her plans to go to Russia to see her parents and her son, whom she had not seen since

12 she moved to Canada in 2001.  At the time of the trial in this matter her son was 17 years old and

13 still resided in Russia.

14       The Petitioner and her two daughters first went to Russia in August 2009 and returned to

15 Canada until early October 2010.  While her initial plan was to stay for several months, she

16 extended her stay at her mother's request and because she wanted her daughters to learn more

17 about Russia.

18       The Respondent testified that he thought the Petitioner and the girls were moving to

19 Russia and that Russia would be their home.  His conclusion was based on the fact (1) that the

20 Petitioner and the girls moved to Russia and (2) that nothing was left in her apartment as

21 everything had been shipped.

22       Prior to Petitioner and the girls traveling to Russia, the Respondent flew to Canada and

23 helped the Petitioner pack.  The Respondent points out that the Petitioner shipped 53 boxes of

24 used household and personal effects which had a total weight of 1169 KGS (2,576 lbs).  Trial

Exhibit 17, Bill of Lading dated August 12, 2009.  However, it is undisputed that the Petitioner also stored a number of items in a storage facility in Toronto (Dkt. 33, pgs. 3 – 4) and left her truck in Toronto as well.  These stored items were moved out of the storage facility on April 1, 2011.  (Dkt. 33, p. 5)  The Respondent's conclusion that in August 2009 the Petitioner intended to make her home in Russia was not based on a conversation or agreement he and the Petitioner reached as to how long she and the girls would be in Russia or even, in fact, what her intention was with regard to her move to Russia.  The letter the Respondent wrote to the Ontario Court of Justice does clearly set forth his understanding, at that time, of the Petitioner's intent on having an "extended stay" in Russia.  There is nothing in that letter that references a permanent move.

The Petitioner and the two girls returned to Toronto in October 2010.  According to the Respondent, the Petitioner returned because she was not getting along with her mother and she was disillusioned with Russia.  According to the Respondent, the Petitioner wants to be in Russia when she is in Canada and vice versa.  The Respondent characterized the return as unexpected as the Petitioner and the girls had no place of their own to live.  This was, however, due to the fact that the Petitioner has always rented an apartment when living in Canada and had never owned any real property in Canada.  Following her return, the Respondent flew to Canada and helped the Petitioner find a place to live.

The Petitioner next went to Russia with her daughters at the end of June 2011.  The Petitioner's purpose of this visit was to see her mother and son and for her daughters to become closer to their brother and grandparents.  When she went to Russia this time she stored some of her belongings with a friend, including her truck.  The Petitioner provided no testimony regarding how long she initially planned to stay in Russia other than to say that she ended up staying longer than she had planned.  She did testify that she never intended to relocate from Canada since becoming a permanent resident there and that testimony is not contradicted.  The

1   Respondent offered no testimony regarding any agreement or understanding between him and

2   the Petitioner regarding the reason the Petitioner and the girls returned to Russia in June 2011.

3   The Respondent did testify that the Petitioner was very concerned about not doing anything that

4   would result in her losing her legal resident card with Canada.

5           Both times the Petitioner and the two girls were in Russia the oldest daughter attended

6   school but the youngest did not as she was too young for school in Russia. Also, when the girls

7   were in Toronto, the oldest daughter always attended the same school.  The oldest daughter

8   finished her school year in Toronto before the return to Russia in April, 2012.  They also

9   received health care in Canada as well as in Russia.

10          The girls remained in Russia until April 12, 2012, when Petitioner and Respondent

11  agreed to meet each other in Berlin, Germany.  The Respondent, with permission of Petitioner,

12  took the two girls to Washington State with him.  Prior to April 12, 2012 the girls had never been

13  in the United States and had never lived with the Respondent.  The girls have remained in

14  Washington since that time.  The parties agree that initially the reason for the girls going to the

15  United States was due to heart-related health problems of their oldest daughter and the need for

16  evaluation and treatment of that condition.  Both parties signed a "Permission to Travel with

17  Minors Letter" (Trial Exhibit 5) which reflected a travel date to Seattle on April 12, 2012 and an

18  expected date of return of May 23, 2012.  The Petitioner said this was needed as she had sole

19  custody of the girls and this document would allow the father to travel with the girls without

20  having any problems.

21          After the Respondent picked up the girls in Berlin, the Petitioner went to Egypt in pursuit

22  of her divemaster certification.  Trial Exhibit 27 is an email exchange between the parties on

23  April 21 and 22, 2012 in which the Petitioner states that she wants her children returned on May

24  27th, which is the date of the return tickets, and she requested that the children been sent to

1  Egypt, where she planned to stay for another month, and then all three would return to Russia.

2  In response the Respondent confirmed that the children would be "coming back on the date on

3  the tickets."

4          The girls were not returned in May and the parties eventually agreed that the Respondent

5  would keep the girls over the summer.  There clearly was a disagreement between the parties as

6  to whether it was safe for the girls to be in Egypt while the Petitioner was pursuing her

7  divemaster certification.  The Respondent felt that there was too much unrest in Egypt so as to

8  make it unsafe for the girls to live there.  The Petitioner, on the other hand, felt that Egypt had a

9  lot to offer her girls and she wanted them there with her.  Trial Exhibit 26.  The Petitioner also

10  testified that the Respondent wanted to keep the girls in Washington over the summer because he

11  had such a short period of time with them and he said he would return them in the fall of 2012.

12          The testimony of the parties is divergent regarding the reason why the girls were not

13  returned in the fall of 2012.  According to the Petitioner, during October 2012 she wanted to

14  know why the Respondent had not returned the girls.  The Respondent said he did not have the

15  money to return the girls and he was also working on obtaining citizenship for the youngest

16  daughter.  The oldest daughter already had her American citizenship.  The parties had applied for

17  American citizenship of the youngest daughter in Toronto but the Petitioner was unaware that the

18  Respondent was pursuing citizenship for the youngest daughter until he advised her of such.  The

19  Respondent told the Petitioner that he wanted to keep the girls with him longer because he

20  thought the youngest might have to be interviewed for citizenship.  So Petitioner agreed to leave

21  the girls in the United States while the Respondent pursued citizenship for their daughter.  At the

22  time of this decision the Petitioner was not living in Canada.  The Petitioner went to Egypt in

23  April 2012 and left Egypt late January 2013.  From Egypt she returned to Russia where she

24

1  remained until mid April 2013 when she returned to Toronto.  The Petitioner completed her

2  divemaster training in June 2013 while in Toronto.

3      The Petitioner obtained a bank loan so she could purchase tickets for the return of her

4  children.  On May 19, 2013 she sent an email to the Respondent advising him she had purchased

5  tickets for the girls and the Respondent to fly to Canada on July 30, 2013.  The tickets were

6  purchased at a Russian travel agency.  (Trial Exhibits 10 and 34).  Two days before the

7  scheduled flight the Respondent called the Petitioner and told her he could not fly the girls to

8  Toronto on the 30th because he had a job interview.  The Respondent testified that it was not an

9  interview but that he actually had a new job which was to start on Monday, July 29th, the day

10  before he was to fly the girls back to Canada so he could not miss work at his new job.  He also

11  disagrees that he made the Petitioner aware of this conflict just two days prior to the scheduled

12  flight.

13      Petitioner made efforts to reschedule the July 30th flight to August 3rd but found it to be

14  complicated and costly.  The Respondent did reschedule the flight to August 16th.  (Trial Exhibit

15  35).  However, the Petitioner could not meet her girls at the airport on those dates as she had to

16  make a short emergency trip to Russia.  She asked the Respondent to reschedule to August 3rd or

17  sometime after she returned from Russia.  The Respondent complained about the financial

18  burden this was placing on him as he was not currently working.  After this discussion the

19  Petitioner went to a police station to report a child abduction and sometime after that she

20  received a call directing her to the Central Authority that operated pursuant to the Hague

21  Convention.  She filed her application with the Central Authority in Canada on January 27, 2014.

22      According to the Respondent, the Petitioner told him she had to return to Russia on

23  August 13, 2013 because her husband attacked her mother in her mother's apartment in Russia.

24  She told him that once she got out of the airport in Russia that she went straight to a store,

1   purchased pepper spray and walked into her mother's apartment and sprayed her husband.   The

2   Respondent also learned from the Petitioner that she had many fights with her husband while in

3   Russia and the police were called four times.

4          The Petitioner returned to Canada on September 10, 2013 and the Respondent had

5   decided prior to that date that he did not want to return his daughters Petitioner.  He testified that

6   in September 2013 he told the Petitioner that he was not going to return the girls to her.  The

7   Petitioner has maintained regular contact with her daughters through email and phone calls or

8   Skype but she has not been able to see them since April 2012.

9          While in Russia, and before the children went to the United States, the Petitioner did

10  register herself and her children with the government.  Subsequent to that registration, she

11  applied to participate in a government plan that would allow her to acquire property there.  She

12  testified that she still has to pay money to put her name and her children's name on the property.

13  The Court found this testimony to be somewhat confusing but it does appear that this application

14  process was to obtain property that would provide a place for them to stay when they visited in

15  Russia.

16         Also while in Russia and with her two children, the Petitioner, her mother, and son

17  moved into a larger apartment.  The move was related to the fact that the Petitioner had more

18  children and they were different genders.  This move had something to do with a government

19  "plan" but that testimony was not clear to the court.  In any event, the Petitioner, her son, mother

20  and two daughters moved into a bigger apartment the end of January or beginning of February

21  2012 and the move was made possible by the fact that the Petitioner and her two daughters were

22  in Russia.

23         Also, on February 2, 2013 Peter Roach signed a letter giving permission to the Petitioner

24  to change the residence of the two girls to a new address in St. Petersburg, Russia.  Trial Exh. 6.

1   According to the Petitioner's testimony, this was necessary in order to transfer the children's

2   registration from her mother's address to a new apartment.  This permission is required under

3   Russian law as both parents have to participate in the decision where the children will be living.

4   According to the Petitioner, Russian law requires children to be registered so they can stay legal

5   and not have any problem with immigration.  It is unclear to the court if this permission to

6   change residence was to the larger apartment discussed above.  The Court notes that this

7   permission letter was signed by the Respondent when the two girls were living with him in the

8   U.S.

9          While in Russia the Petitioner married Waleed Kanzel.  The Petitioner did not provide a

10  date for that marriage and the Respondent said he found out about it sometime in 2013.  They are

11  currently separated and do not have a relationship.  According to the testimony of the

12  Respondent, the Petitioner and Kanzel had a contentious relationship.  For example, on June 29,

13  2014 the Petitioner inadvertently sent an email meant for her mother to her daughter.  In it she

14  stated that Waleed had her put in jail in Montreal.  She also asked her mother to get Waleed's

15  police record in Russia as soon as possible.  As noted above, the Petitioner also returned to

16  Russia in August 2013 because her husband had attacked her mother.  The Respondent testified

17  he is concerned for the safety of his children if Waleed Kanzel is part of their life and he points

18  to a totally inappropriate email from Waleed Kanzel (Trial Exh. 30, dated July 9, 2014) as

19  further support for his concern.

20         The Respondent also testified regarding the two girls and their life with him in the U.S.

21  They are attending school and are excellent students, go to church with the Respondent,

22  participate in band and gym and have many friends.  They have a very good relationship with the

23  Respondent's wife and they call her aunt.  With regard to his oldest daughter, she has been

24  evaluated for her heart condition and she does not require surgery.  Instead, she sees her

1  cardiologist every six months or so.  The only treatment recommended apparently is to have

2  reduced stress.  The youngest daughter has asthma and at times requires an inhaler.  While there

3  may have been some difference of opinion regarding use of an inhaler for the youngest daughter,

4  there is no evidence that the Petitioner ever withheld the inhaler nor that she would do so.  To the

5  contrary, the evidence is that the two girls, when in the custody of the Petitioner, received

6  appropriate medical care.

7  **Olga Anetko.**

8       Olga Anetko is the godmother to one of the girls and has known them for most of the

9  girls lives.  They communicate frequently with her in Canada and when she is not in Canada, the

10  girls can make calls in Skype.  Olga showed up at the Respondent's house on April 29, 2014.

11  Based on what occurred, the Respondent concluded that Olga was their to kidnap the girls and

12  return them to their mother in Canada.  Olga denied that in her deposition.  Regardless, the girls

13  were thrilled to see Olga and, to the Respondent's credit, he did facilitate their visit.

14                                    **DISCUSSION**

15  **Habitual residence.**

16       Based on the facts, the Court concludes that the habitual residence of the two girls, prior

17  to their retention by the Respondent, was Canada.  As noted, in order to establish a habitual

18  residence, there must be a settled mutual intention of the parents.  While there was no direct

19  testimony in this regard, the circumstances surrounding the two girls living in Toronto lead to the

20  conclusion that the parents agreed to this as the girls habitual residence.  They were both born in

21  Toronto, attended school there when old enough, received medical care and the father visited

22  with them in Canada.  He also acknowledged this as their residence when he wrote the letter to

23  the Ontario Court of Justice in which he identified the residence of the two girls as being in

24  Canada.  There is really no dispute about this being their habitual residence.

**Abandonment.**

The dispute in this case arises with the Respondent arguing first that the habitual residence in Canada was abandoned in favor of Russia. Clearly there was no settled, mutual intention in this regard. There was no evidence presented about the parties having any discussion as to the reason the Petitioner and the girls would be going to Russia in 2009, how long they would be there or that they had any intention of making Russia their home.

The letter written by the Respondent to the Ontario Court of Justice merely discusses an "extended stay" in Russia. In addition, the Respondent was very much aware of the fact that the Petitioner did not want to do anything that would cause her to lose her resident status in Canada. The Respondent asserted that the Petitioner and the two girls intended to make Russia their home when they moved there in 2009 because they moved out of the apartment and shipped all their belongings to Russia. Moving out of a rented apartment, when planning on an extended stay in Russia, cannot lead to the conclusion, without more, that the habitual residence in Canada was going to be abandoned. In addition, while the Petitioner did ship a large number of personal items to Russia, she also stored personal property in Canada, including her vehicle. If there had been no intention to return, it is reasonable to assume that the Petitioner would have sold the vehicle rather than stored it. Finally, the Petitioner and the two girls in fact returned to Canada after an extended stay in Russia. For these reasons, the Court concludes that with regard to the 2009 trip to Russia that there was no shared mutual intent to abandon Canada as the habitual residence as there was no agreement between the parties to that effect.

Even if the Court were to assume that the Petitioner had sole decision making authority, as allowed by the order of the Ontario Court of Justice, there is insufficient evidence before the Court to lead to the conclusion that the Petitioner intended to abandon Canada in favor of Russia as the girls habitual residence, for many of the same reasons identified above.

1    The Petitioner again moved to Russia from Canada in the end of June 2011.  The only

2    testimony regarding the purpose of this trip was from the Petitioner and that was to visit with her

3    mother and son and to have time for her daughters to become closer to their brother and

4    grandparent.  No testimony was presented as to how long the Petitioner intended to stay in

5    Russia other than the fact that she ended up staying longer than she intended.  The Respondent

6    provided no testimony regarding any discussion or agreement with the Petitioner as to why she

7    and the girls were going to Russia.  This can only lead to the conclusion that there was no shared,

8    mutual settled intention to abandon Canada as the girls habitual residence.  Since there was no

9    shared mutual settled intention to abandon Canada, the Court concludes that the Petitioner was

10   away from her habitual residence for a temporary absence of long duration.

11   Because there was never a shared mutual intent to abandon Canada as the habitual

12   residence for the two girls, the Court must also consider whether there are objective facts which

13   point to that conclusion.   The Court concludes that being present in Russia which permitted her

14   mother and son to move to a larger apartment, starting the process of obtaining real property in

15   Russia, and the permission granted the Petitioner by the Respondent to change the place of

16   registration for the girls in Russia does not point to an intention, on the part of the Petitioner, to

17   change her habitual residence.  Rather, the steps taken by the Petitioner were her right as a

18   Russian citizen.  Nothing has been presented to the Court to show that these actions could only

19   have been taken if the Petitioner intended to reside permanently in Russia.  Even marrying while

20   in Russia does not support the argument of abandonment as her husband, though they are

21   separated, now resides in Canada.

22   In addition, there is no evidence before the Court for it to conclude that the Petitioner

23   abandoned Canada as the habitual residence of the girls in favor of the United States.  There was

24   no agreement between the parties to that effect.  In fact, the Petitioner and Respondent initially

1    agreed that the Respondent would have the girls because of their oldest daughter's health related

2    problems.  At no time did the Petitioner ever agree to have the girls reside with the Respondent

3    for an indefinite period of time.  In fact, it appears that the Petitioner and Respondent regularly

4    discussed the return of the girls to the Petitioner but for various reasons, the Petitioner agreed to

5    extend the stay with the Respondent in anticipation of the girls being returned by a future date

6    agreed to by the parties.  In that respect, the Court believes the Petitioner's testimony that she

7    and the Respondent subsequently agreed to have the girls returned by the end of the fall of 2012,

8    that the girls could continue to live with the Respondent while he pursued American citizenship

9    for their youngest daughter, and that they would be returned on July 30, 2013 based on the

10   tickets that the Petitioner purchased for the return of the girls to her in Toronto.  While the

11   amount of time the girls stayed with their father kept expanding, it was as the result of

12   negotiation and agreement of the parties and does not show any intent on the part of the

13   Petitioner to abandon Canada as the habitual residence of the girls nor do the facts surrounding

14   these agreements lead to the conclusion that Canada was abandoned as the habitual residence.

15   **Acclimitization.**

16          While it is clear that the Respondent is a caring and responsible father who has also gone

17   out of his way to provide financial support to the Petitioner when he was under no legal

18   obligation to do so, the Court cannot conclude that the evidence of acclimatization is sufficient to

19   establish that Canada has been abandoned as the girls habitual residence due to acclimatization.

20          The Respondent has presented testimony that one would commonly expect from a

21   responsible parent but, in light of the Court's direction to "be slow to infer from such contacts

22   that an earlier habitual residence has been abandoned" this Court does not believe that the

23   evidence is sufficient to overcome this directive.

24

1    As noted in *Mozes,* children are remarkably adaptable.  Yet, the Court cannot help but

2    note how excited the girls were to see Olga Anetko and notes that they keep in regular contact

3    with her.  They also speak regularly with their mother and there is no suggestion before the Court

4    that they do not love their mother nor is there any suggestion before the Court that they do not

5    wish to be with her.  "It thus makes sense to regard the intentions of the parents as affecting the

6    length of time necessary for a child to become habitually resident (footnote omitted) because the

7    child's knowledge of these intentions is likely to color its attitude toward the contacts it is

8    making." *Mozes, supra,* at 1079-80.  While the girls have spent over two years now with the

9    Respondent, they also grew up with their mother being the only parent.  The Court concludes

10   that returning the girls to Canada would not be tantamount to taking them "out of the family and

11   social environment in which [their] life has developed." *Mozes, supra,* at p. 1081.

12   **Affirmative Defense – Grave Risk of Harm.**

13   If the Respondent proves his affirmative defense by clear and convincing evidence, then

14   the Court is not required, by the Convention, to return the girls to Canada.  However, the Court

15   concludes that the Respondent has fallen short of the required proof.

16   The Respondent asserts the affirmative defense that "there is a grave risk" that return of

17   the girls "would expose the child[ren] to physical or psychological harm or otherwise place the

18   child in an intolerable situation."

19   The Respondent pursued this defense first with regard to the medical needs of the girls

20   and second with regard to the Petitioner's current husband.  As it relates to medical care, there is

21   a lack of evidence that returning the girls to the Respondent would result in them being harmed –

22   much less there being a grave risk of harm.  At the most, the testimony supported a conclusion

23   that the parents may have different ideas as to appropriate medical care but there is no evidence

24   that either parent would ever ignore the healthcare needs of either daughter.  With regard to the

Petitioner's current husband, the uncontroverted testimony is that the Petitioner and her husband are separated and live in different cities.  While their relationship, as described, is concerning, it alone does not meet the high standard of showing a grave risk of harm.

**Additional Determinations under *Mozes*.**

Having determined that the children were habitually resident in Canada prior to their wrongful retention, the Court is also required to answer three additional questions.

First, the Court must determine the date the retention at issue took place.  Based on the testimony, the Court concludes that the wrongful retention occurred in September 2013.

The next question asks whether the retention breached the rights of custody attributed to the Petitioner under the law of the habitual residence.  The parties did not dispute this issue at trial and the Order of the Ontario Court clearly states that the Petitioner has custody of the two girls.  Retaining the girls in Washington breached the Petitioner's custody rights.

Finally, the Court must determine whether the Petitioner was exercising her custody rights at the time of the retention.  Again, the Court concludes that she was.  She was in contact with the Respondent regularly and always inquiring about and demanding the return of her daughters.  She had not relinquished any custody rights and was exercising them at the time the Respondent decided to retain them.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Petitioner Inna Kharlamova's Petition for the return of her children to Canada.  The parties shall meet and confer no later than seven days from the date of this Order regarding arrangements for the return of the minor children to Canada.  Respondent is responsible for the cost of the children's transportation to Petitioner's home in Canada.  *See* 42 U.S.C. § 11607(b)(3)("Any court ordering the return of a

1    child … shall order the respondent to pay … transportation  costs related to the return of the

2    child, unless the respondent establishes that such order would be clearly inappropriate.")

3            DATED this 6th day of October, 2014.

4

5

6                                    Karen L. Strombom
                                     United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24